**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted January 7, 2020[*]
Decided January 7, 2020

**Before**

DIANE P. WOOD, *Chief Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 19-1006

| | |
|---|---|
| REGINALD SHANKLIN, | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Central District of Illinois. |
| | |
| *v.* | No. 16-CV-4010 |
| | |
| ANDERSON FREEMAN, et al., | Harold A. Baker, |
| *Defendants-Appellees*. | *Judge*. |

**O R D E R**

Reginald Shanklin, an African-American civil detainee at an Illinois treatment facility, accuses staff of violating his equal-protection rights and the First Amendment when they assigned his tasks, decided his therapy, disciplined him, and housed him. *See* 42 U.S.C. § 1983. The district court entered summary judgment for the defendants, correctly ruling that no reasonable juror could find that forbidden reasons motivated the staff's decisions. Thus, we affirm.

---

[*] We have agreed to decide the case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

Shanklin has resided since 2006 at the Treatment and Detention Facility in Rushville, Illinois, as a sexually violent person. *See* 725 ILCS 207/1–99. Rushville allows some residents to work at "tasks" that earn "points," which function as currency. "Off-unit" tasks take a resident away from his residential unit; residents covet these tasks as they involve less supervision and earn more points. Because of the nature of the facility, Rushville also enforces rules of conduct. If a resident violates a rule, Rushville may revoke his permission to earn extra points with off-unit tasks. For major violations, it may also put the violator on "close status," a period when the resident wears a yellow uniform, loses privileges, and is escorted in handcuffs by a guard. Before the events beginning in 2013 that Shanklin spotlights in this suit, he violated Rushville's rules and "sexually acted out" at least four times. After each incident, Rushville removed Shanklin from his off-unit task. Beginning in 2013, Shanklin recounts several decisions that Rushville made that he believes reflect discrimination and retaliation.

The first occurred when, in late 2013, Rushville removed Shanklin from one of his two off-unit tasks. He had not violated any rules in the five days since he started the task, but staff explained that Rushville had not cleared him to perform that task and had mistakenly assigned it to him. Staff offered to reassign him to an on-unit task instead and invited him to apply for off-unit tasks when Rushville posted them later. Dissatisfied, Shanklin filed grievances about this reassignment.

Second, about a year later, Shanklin admitted in a group therapy session to having sex with another resident for five years. Rushville assessed him (and the other resident, who was white) with a rule violation. Following the violation, Shanklin stopped attending therapy and asked for a new treatment team. Rushville denied the request and assigned him to a new therapy program (run by the same treatment team) that staff said served his needs, but Shanklin viewed as a demotion. Around this time, staff also assessed that Shanklin was "in a bad place" and at "high risk" because he abused off-unit tasks to contact other residents and to "facilitate sexual acting out, trading, and trafficking, etc." After this assessment, in 2015, Rushville removed Shanklin from all off-unit tasks and said that he was eligible for only on-unit tasks. When Shanklin showed up for an off-unit task the next day, he received a disciplinary warning. (The warning, which was not a violation, did not lead to any further loss of privileges.)

Next, a video recording showed Shanklin and another resident showering together for a half hour. Based on his history, Rushville put Shanklin on 30 days of close status; the other resident, who was white, was assigned 30 days as well, but Rushville

ended his close status after 3 days. Shanklin ended up serving 31 days because of a recordkeeping error. Rushville has said that it will reduce any future close-status term by one day.

Finally, Shanklin contests Rushville's response to two housing requests. First, when Shanklin returned to his unit after his stint on close status, a resident threatened him. Shanklin requested a move, which Rushville granted. Rushville took two weeks to move him, a pace that Shanklin thought too slow. Shanklin requested another move later that year, stating that he was at risk of sexually acting out with the residents in his unit. Rushville denied this second request. It explained that the unit he wanted housed more residents with whom he had sexually misbehaved in the past, so that unit presented a higher risk than his current placement.

Shanklin brought this suit to charge that Rushville's staff discriminated and retaliated against him in his task assignments, therapy, discipline, and housing. The district court entered summary judgment for the defendants, reasoning that Shanklin did not point to a better treated, similarly situated resident or otherwise show evidence of racial or retaliatory animus.

On appeal, Shanklin first contends that the defendants violated his right to equal protection by giving him less favorable tasks, therapy, discipline, and housing as compared to his white counterparts. To avoid summary judgment on these claims, Shanklin "needed to come forward with evidence that would allow a reasonable jury to infer that the defendants intentionally treated him differently because of his race." *Lisle v. Welborn*, 933 F.3d 705, 719 (7th Cir. 2019). We review the grant of summary judgment de novo, drawing all reasonable inferences for Shanklin. *See de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 558 (7th Cir. 2019).

As is permissible in discrimination cases, for each of Rushville's decisions that Shanklin criticizes, Rushville supplied evidence of a non-discriminatory explanation. *See id.* at 561. Regarding the off-unit tasks, Rushville removed Shanklin from some because it had not cleared him for the task and from others because of the "high risk" that he planned to use the tasks to contact residents for "sexual acting out, trading, and trafficking." As for Shanklin's therapy, staff notes show that Rushville reassigned Shanklin to new therapy because it was clinically tailored to his needs after he had stopped attending his regular therapy and confessed to a major rule violation (sex with a resident). Regarding the discipline of close status after the shower incident, Shanklin does not dispute that he violated the rule prohibiting sexual contact and that Rushville

also punished the white resident who showered with him. Finally, on the rooming assignments, Rushville assigned Shanklin to his residential unit based on its assessment of threat that he faced and his history of sexual misbehavior.

Shanklin replies that these reasons are pretextual. A plaintiff presents a triable question of pretext with evidence that the defendant treated the plaintiff less favorably than similar comparators of a different race. *See Lisle*, 933 F.3d at 720. This means Shanklin must provide evidence that the staff who reassigned his tasks, changed his therapy, disciplined him, and housed him treated him less favorably than whites who were materially similar in behavioral and clinical history. He has not. Regarding his removal from off-unit tasks, he submitted affidavits from white residents. The white residents say that they admitted past sexual misconduct to Rushville, yet Rushville did not remove them from off-unit tasks. But those affiants do not describe or quantify their offense history. A jury would thus have to speculate whether they are comparable to Shanklin, who by 2013 had "sexually acted out" four times and then stopped attending therapy, sparking staff concern about his off-unit behavior. Regarding his discipline of close status, Shanklin points to the white resident who showered with him but received only 3 days of close status compared to Shanklin's 31 days. But again, Shanklin provides no evidence of this resident's behavioral, disciplinary, and treatment history, so once more a jury could only speculate whether he is comparable.

Shanklin tries to show pretext another way, but it is unavailing. He argues that as of 2013 Rushville knew about his past sexual misconduct yet assigned him off-unit tasks anyway; therefore, when it removed him from those tasks, it did so because of his race. But Rushville had other, unrebutted reasons for removing Shanklin from off-unit tasks. In 2013, Rushville removed him from an off-unit task because he lacked clearance for it. Then in 2015 Rushville removed him from off-unit tasks because, in addition to Shanklin's misconduct of quitting regular therapy and committing a new sex offense, staff assessed that he was abusing off-unit tasks for improper contact with residents. Thus, Rushville's willingness to tolerate Shanklin's earlier sexual misconduct did not disable it from deciding, based on new information, that off-unit tasks were now risky—unless it decided differently for white residents with comparable histories. But, again, no evidence suggests this.

That brings us to Shanklin's First Amendment claims. He argues that Rushville retaliated against him unlawfully because months after he filed grievances challenging his removal in 2013 from his off-unit task, Rushville changed his therapy, disciplined him for "sexually acting out," removed him permanently from off-unit tasks, and

refused his housing requests. To survive summary judgment on these claims, Shanklin "must show: (1) he engaged in protected activity; (2) he suffered a deprivation likely to deter future protected activity; and (3) his protected activity was a motivating factor in the defendants' decision to retaliate." *Daugherty v. Page*, 906 F.3d 606, 610 (7th Cir. 2018). We focus on the third element.

We agree with the district court that Shanklin presented no evidence that his grievances motivated Rushville's decisions. He relies entirely on the timing sequence: the adverse decisions came months after he filed grievances. But "[s]uspicious timing may be just that—suspicious—and a suspicion is not enough to get past a motion for summary judgment." *McGreal v. Village of Orland Park*, 850 F.3d 308, 314 (7th Cir. 2017) (internal citations and quotation marks omitted). And as explained above, Rushville offered unrebutted, legitimate reasons for its actions. It changed Shanklin's treatment program to serve his clinical needs, it removed him from off-unit tasks and disciplined him because of his rule violations, and it denied his rooming request to avoid the risk of contact with certain residents. Because Shanklin offers no evidence that Rushville treated more favorably any resident with a comparable history who had not filed grievances, he has not rebutted these explanations. The district court was thus correct to enter summary judgment in favor of the defendants.

AFFIRMED